Cite as 2021 Ark. 158

# SUPREME COURT OF ARKANSAS

**No.** CR–21–3

| | |
|---|---|
| TERRY MARSHALL, JR.<br><div align="right">APPELLANT</div><br>V.<br><br>STATE OF ARKANSAS<br><div align="right">APPELLEE</div> | **Opinion Delivered:** September 16, 2021<br><br>APPEAL FROM THE CLEBURNE COUNTY CIRCUIT COURT<br>[NO. 12CR-17-153]<br><br>HONORABLE TIM WEAVER, JUDGE<br><br><u>AFFIRMED</u>. |

**ROBIN F. WYNNE, Associate Justice**

Terry Marshall, Jr., appeals his conviction in the Cleburne County Circuit Court of first-degree murder, for which he was sentenced to life imprisonment. On appeal, Marshall argues that the trial court abused its discretion by not giving a jury instruction on second-degree murder, a lesser-included offense of first-degree murder. We affirm.

Marshall was charged with first-degree murder for fatally shooting his wife, Brittany Marshall, in the early morning hours of August 31, 2017. The night before the shooting, Marshall was home watching a movie with Brittany and their two sons before going with Brittany to their bedroom. Marshall, who testified at trial, said that the movie characters told him to "put the subject [i.e., Brittany] down." He testified that he switched places with Brittany on their bed so that he would be closer to his pistol. He said that he checked Brittany's pulse and determined she was a computer, not real, before he shot her. He testified that he checked to make sure a bullet was in the chamber of the pistol before he shot Brittany. He said that he put the gun point blank to Brittany's right eye and turned his head

because he thought the gun might explode when he pulled the trigger. He said that it was clear after he shot Brittany that she was a computer. He testified that he "put the digital computer down" and "took her out" when he shot Brittany, but he also testified that he did not kill his wife.

Later that morning, Marshall took his older son to his parents' house. Marshall returned home and wrapped Brittany's body in sheets and netting and put her in the back of his truck. When Marshall and his younger son returned to his parents' house several hours later, Marshall's father saw Brittany's body in the truck and called the police. Marshall told the police in an interview after his arrest that he "snapped" and that the body in his truck was not Brittany, but a clone.

Marshall raised the affirmative defense of mental disease or defect. At trial, Marshall claimed that he was living in a digital world and referred to Brittany as his digital wife, a computer, a clone, an avatar, and a robot. Marshall's father and Marshall's sons testified that Marshall called Brittany and other family members robots. On one occasion, Marshall tried to cut open the family dog to prove that it was a robot before his father stopped him. A couple of weeks before the shooting, Marshall was arrested after an argument with Brittany at his parents' house and was involuntarily committed to The BridgeWay, an inpatient psychiatric hospital. Dr. Danielle Bell, a psychiatrist who treated Marshall at The BridgeWay, testified that she diagnosed Marshall with schizoaffective disorder, which is characterized by auditory and visual hallucinations along with a mood component such as depression or bipolar manic symptoms. Dr. Benjamin Silber, a psychologist at the Arkansas State Hospital, testified about the results of fitness-to-proceed and criminal-responsibility

evaluations he conducted of Marshall at the Arkansas State Hospital. Dr. Silber stated that, in his opinion, Marshall was malingering—feigning or exaggerating mental health symptoms for a specific external benefit or gain.

The trial court denied Marshall's request to instruct the jury on second-degree murder, finding there was no evidence that Marshall intended anything but to purposely take Brittany's life. Marshall proffered a second-degree-murder instruction. The jury found Marshall guilty of first-degree murder and sentenced him to life imprisonment. This appeal followed.

For his sole point on appeal, Marshall argues that the trial court abused its discretion by not instructing the jury on second-degree murder, a lesser-included offense of first-degree murder. We will not reverse a trial court's ruling on whether to give a jury instruction absent an abuse of discretion. *Armstrong v. State*, 2020 Ark. 309, at 9, 607 S.W.3d 491, 498. The refusal to give an instruction on a lesser-included offense is reversible error if the instruction is supported by even the slightest evidence. *Id.* But we will affirm the trial court's decision to not give an instruction on a lesser-included offense if there is no rational basis for doing so. *Id.* A trial court is not obligated to charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him or her of the included offense. Ark. Code Ann. § 5-1-110(c) (Repl. 2013).

The trial court instructed the jury on only first-degree murder. A person commits first-degree murder if, with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5-10-102(a)(2) (Supp. 2021). "A

3

person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2013). A person commits second-degree murder if the person knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life; or, with the purpose of causing serious physical injury to another person, the person causes the death of any person. Ark. Code Ann. § 5-10-103(a)(1)−(2) (Repl. 2013) . A person acts knowingly with respect to "a result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result." Ark. Code Ann. § 5-2-202(2)(B). The mental state of "purposely" incudes that of "knowingly." *McCoy v. State*, 347 Ark. 913, 924, 69 S.W.3d 430, 436 (2002).

To be entitled to an instruction on the lesser-included offense of second-degree murder, Marshall must be able to point to evidence in the record that supports a finding that he acted with a "knowing" mental state rather than a "purposeful" mental state or that he acted with the intent of only causing serious physical injury to Brittany. *See Britt v. State*, 344 Ark. 13, 23, 38 S.W.3d 363, 370 (2001).

Marshall offers a series of scenarios in which he argues that the jury could have found him guilty of second-degree murder. In the first scenario, Marshall asserts that there was evidence that his purpose was to disable or deactivate—not kill—Brittany, who he said was a computer or robot. If death was not his purpose, Marshall argues, the jury could have found that he acted under circumstances manifesting extreme indifference to the value of human life and found him guilty of second-degree murder. Marshall relies on *McCoy* to

4

argue that a defendant's purpose can provide a basis for a second-degree-murder instruction. In *McCoy*, we held that a second-degree murder-instruction was warranted where there was evidence that the defendant shot at the victim to stop her from calling the police, not to kill her. 347 Ark. at 927, 69 S.W.3d at 439. Here, Marshall testified that he shot Brittany to "take her out." There was no evidence of any other purpose. And even if the jury believed that Marshall thought he was acting to disable a nonhuman robot, there would be no rational basis for a finding that he knowingly acted with extreme indifference to the value of human life.

Second, Marshall argues that if his purpose was to disable or deactivate Brittany, rather than to kill her, he could have done so without using a gun. But Marshall asserts that by using a gun, he should have "been practically certain that his . . . conduct" would cause Brittany's death, which meant he acted knowingly under Arkansas Code Annotated section 5-2-202(2)(B) and was therefore entitled to a second-degree-murder instruction. Marshall relies on *Wyles v. State*, 357 Ark. 530, 182 S.W.3d 142 (2004), for the proposition that a second-degree-murder instruction is warranted when the jury could conclude that the defendant could have known that his actions were practically certain to cause the victim's death. In *Wyles*, there was evidence that the defendant and his wife had been in an argument that escalated into physical violence before the defendant put his wife in a headlock or chokehold, killing her. *Id.* at 537, 182 S.W.3d at 147. No such evidence is present here. We have said that the mental state of purposely includes that of knowingly. *McCoy*, 347 Ark. at 924, 69 S.W.3d at 436. Even if Marshall should have been "practically certain" that his conduct would result in Brittany's death, it does not follow that he did not act purposely

5

when he shot her. And using a gun—instead of some other method—to kill someone does not by itself warrant giving a second-degree-murder instruction.

In the third scenario, Marshall points to a statement he made to Dr. Silber that he checked for Brittany's pulse and determined that it had stopped before he shot her. He argues that if the jury had found that Marshall decided to shoot Brittany after failing to find a pulse, the jury could have found that Marshall's purpose was to cause serious physical injury. Or, Marshall argues, the jury could have found that he manifested extreme indifference to the value of human life when he relied on his assessment of Brittany's pulse before deciding to shoot her. However, Marshall testified at trial that Brittany's pulse was irregular, not stopped. In any event, Marshall does not explain why his determination that Brittany had no pulse—that is, that she was already dead—before he shot her entitles him to a second-degree-murder instruction.

Fourth, Marshall argues that a statement he made to Dr. Silber during his evaluation that he thought he was firing a blank at Brittany supports a finding that he acted with extreme indifference to the value of human life and that he could have been practically certain that firing a blank from close range would result in her death. But Marshall testified at trial that he checked to make sure a bullet was in the chamber before shooting Brittany. And just as the act of using a gun does not provide a rational basis for giving a second-degree-murder instruction, the act of firing a blank does not either.

In the fifth scenario, Marshall points to evidence in the record that he and Brittany had been arguing before the shooting and his statement that he "snapped" when he shot her as support for a second-degree-murder instruction. Given evidence that he and Brittany

6

had been fighting, Marshall argues that the jury could have found that his "snapping" reflected extreme indifference to the value of human life or that he intended to cause Brittany physical injury to protect himself. But the evidence does not support a finding that Marshall acted other than purposely when he shot her. Marshall testified that he shot Brittany after movie characters told him to put her down. He said that he switched places with her on the bed so that he would be closer to his gun and checked to make sure there was a bullet in the chamber of his gun before shooting her. In light of this testimony, evidence that he and Brittany may have been arguing earlier does not provide a rational basis for a second-degree-murder instruction.

Finally, Marshall contends that a second-degree-murder instruction was warranted because the jury could have found that his act of pointing a gun at Brittany and pulling the trigger manifested extreme indifference to the value of human life and that Marshall therefore knowingly caused Brittany's death. Similarly, he argues that the jury could have found that his purpose in shooting Brittany was to cause serious physical injury. This argument is similar to the one Marshall made in the second scenario and fails for the same reason. Simply using a gun to kill someone—without additional evidence—does not provide a rational basis for giving a second-degree-murder instruction.

None of the evidence Marshall presents in these scenarios—that his purpose was to disable a robot, that he used a gun, that he checked Brittany's pulse before shooting her, that he believed he was shooting blanks at a robot, or that he and Brittany may have been fighting—provides a rational basis for the jury to acquit Marshall of first-degree murder and convict him of second-degree murder. *See* Ark. Code Ann. § 5-1-110(c). Marshall testified

that he "took [Brittany] out" and "put [Brittany] down." He testified that he shot Brittany point blank in the eye after confirming that a bullet was in the chamber of his pistol. There is no evidence in the record to support a finding that he acted with a knowing rather than purposeful mental state in shooting Brittany or that his purpose was only to cause physical injury. *See Britt*, 344 Ark. at 23, 38 S.W.3d at 370. We conclude that the trial court did not abuse its discretion in refusing to give a second-degree-murder instruction because there was no rational basis for giving the instruction.

*Rule 4-3(a) Review*

Because Marshall was sentenced to life imprisonment, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Marshall in compliance with Arkansas Supreme Court Rule 4–3(a). No prejudicial error has been found.

Affirmed.

*Brett D. Watson*, *Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.